UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

*Norfolk Division*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal No. 2:15cr153-001 |
| v. | ) | |
| | ) | |
| GREGORY G. HATT, | ) | |
| | ) | Sentencing Date: May 19, 2016 |
| Defendant. | ) | |

## **GOVERNMENT'S POSITION ON SENTENCING**

The United States of America, through its attorneys, Dana J. Boente, United States Attorney, and Alyssa Nichol and John F. Butler, Special Assistant United States Attorneys, hereby submits its position with respect to the defendant's sentencing factors. In the Presentence Investigation Report (PSR) prepared in this matter, the United States Probation Office determined the applicable advisory guidelines sentence to be a term of life imprisonment (Offense Level 48 and Criminal History Category V), with a statutory mandatory minimum sentence of 20 years' imprisonment and a maximum of life imprisonment. In accordance with Section 6A1.2 of the Sentencing Guidelines Manual and this Court's policy regarding sentencing, the United States represents that it has reviewed the PSR and conferred with the United States Probation Officer assigned to this matter and with defense counsel. The United States has no objections to the PSR. There is one outstanding objection to the PSR, which is discussed below.

After considering each of the 18 U.S.C. § 3553(a) factors, the PSR, and this defendant's criminal record, the United States respectfully submits that a life sentence is appropriate and warranted.

1

## I. SUMMARY OF ARGUMENT

This defendant caused the death of Monica Beaudry and nearly killed three others. He played a direct role in the heroin overdose epidemic that the Commonwealth and the nation as a whole are struggling with today. Heroin and opioid fatalities have now surpassed car accidents as the number one cause of accidental death in Virginia. Despite his significant criminal record, and despite the fact that his heroin took the life of a young woman, the defendant continued to sell heroin after her death, and those sales led to more overdoses, including overdoses of United States Navy sailors.

A life sentence will prevent this defendant from taking another life, and will serve the purposes of general deterrence by putting others on notice of the heavy consequences for dealing heroin that results in an overdose death, as it so often does. The government believes that a life sentence appropriately reflects the seriousness of the crime. It does not recommend such a significant sentence lightly, and it does not ground its request solely on the need for general or specific deterrence, or solely because of the death of Monica Beaudry, as tragic as that death is. The government's recommendation takes into account each of those things, but it also factors in this defendant's criminal history, his leadership in a drug conspiracy, the fact that his offense level is five points beyond what the Sentencing Guidelines contemplate, the weapons involved in this case, and other aggravating facts that separate this case from other heroin overdose cases prosecuted in this district.

## II. MOTION

The United States moves this Court, pursuant to U.S.S.G. § 3E1.1(b) and based upon the terms of the binding plea agreement in this case, to grant an additional one-level reduction in the defendant's offense level for acceptance of responsibility. The defendant timely notified the

United States of his intention to enter a plea of guilty, thereby allowing the United States to avoid preparing for trial and permitting the United States and the Court to allocate their resources efficiently.

## III. OBJECTION

On April 28, 2016, the defense requested that paragraph 11 and the last sentence of paragraph 10 of the PSR be omitted. The United States has agreed not to object to this request and notes that omitting those portions of the PSR will have no impact on the sentencing guidelines.

## IV. BACKGROUND

The defendant has been found guilty of Distribution of Heroin Resulting in Death, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). From July 2014 through July 2015, the defendant distributed heroin out of his home on Dylan Drive in Virginia Beach, Virginia. He distributed heroin to a number of friends and associates, some of whom in turn further distributed the heroin they received from the defendant. In the summer of 2014, he began dating his co-defendant, Megan Garton. The defendant involved Garton in his heroin distribution operation, to the point where she was regularly meeting with suppliers, together with the defendant, and weighing and selling heroin out of their shared Dylan Drive residence, with and without the defendant.

One individual to whom the defendant distributed heroin was a young woman by the name of Monica Beaudry. The defendant distributed heroin to Ms. Beaudry several times. On one occasion in December 2014, he distributed heroin to Ms. Beaudry and her friend, A.S., who suffered a non-fatal overdose as a result. Fortunately, one of the defendant's roommates was able to revive A.S. on that occasion.

A few weeks later, on December 26, 2014, the same two young women, Ms. Beaudry and A.S., went out in Virginia Beach to celebrate Ms. Beaudry's twenty-third birthday. While they were out, they received a text message from the defendant, stating that he had a birthday present for Ms. Beaudry. The young women went to the defendant's residence, where the defendant gave Ms. Beaudry heroin. Shortly after injecting the heroin, Ms. Beaudry began to experience the symptoms of an overdose: foaming at the mouth, difficulty breathing, and eventually the loss of consciousness. The defendant refused to call for emergency assistance. Some time later, Ms. Beaudry was put in the back of a car and driven to a local hospital, where she was pronounced dead.

The defendant knew that his heroin had killed Ms. Beaudry, but that did not stop him from continuing to distribute the drug. Among his clients were an active duty U.S. Navy sailor and his wife. In February 2015, the sailor and his wife smuggled heroin they bought from the defendant and Garton on board an aircraft carrier stationed at Naval Station Norfolk. Once on the aircraft carrier, the couple used some of the heroin and sold some of it to a female Navy sailor. Both the sailor who purchased the heroin from the defendant and the female sailor to whom it was distributed overdosed. Both lived, but the female sailor was without a detectable pulse for approximately fourteen minutes, at which point medical personnel were able to revive her.

The defendant continued to distribute heroin through July 24, 2015, when agents with the Naval Criminal Investigative Service and detectives from the Virginia Beach Police Department executed a search warrant on his residence. Law enforcement agents seized 36.6 grams of heroin, 17 grams of cocaine, digital scales, a machine press, needles, syringes, and multiple

loaded firearms from the defendant's residence. The firearms included a loaded sawed-off shotgun, which the defendant kept next to his bed.

The PSR reveals that the defendant has a lengthy criminal history, including multiple prior drug offenses. He was convicted of Possession of Marijuana in 2006, Possession of Cocaine in 2007, and Possession with Intent to Distribute Marijuana in 2011. The defendant also has convictions for driving under the influence, driving with a suspended license, assault and battery, a protective order violation, and reckless driving.

**V.    PROCEDURAL HISTORY**

On November 19, 2015, the defendant was charged in an eight-count Indictment returned by a federal grand jury in the Eastern District of Virginia. On December 18, 2015, the grand jury returned an eight-count Superseding Indictment charging the defendant with the following crimes: one count of Conspiracy to Distribute Heroin, in violation of 21 U.S.C. § 846; one count of Distribution of Heroin Resulting in Death, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C); two counts of Distribution of Heroin, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C); one count of Possession with Intent to Distribute Heroin, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C); one count of Possession with Intent to Distribute Cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C); one count of Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g); and one count of Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. §§ 924(c)(1)(A) and (c)(1)(B)(i).

On February 9, 2016, the defendant entered a plea of guilty to Count Two of the Superseding Indictment, which charged him with Distribution of Heroin Resulting in Death, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C).

## VI. ARGUMENT

With a Total Offense Level of 48 and a Criminal History Category of V, the defendant's advisory guidelines sentence is life imprisonment. In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court made clear that sentencing courts should consult [the Sentencing] Guidelines and take them into account when sentencing." 543 U.S. at 264. The Supreme Court provided this direction to promote the sentencing goals of Congress, namely to "provide certainty and fairness in meeting the purposes of sentencing, [while] avoiding unwarranted sentencing disparities." *Booker*, 543 U.S. at 264 (quoting 28 U.S.C. § 991(b)(1)(B)). In its recent decision in *Molina-Martinez v. United States*, the Court emphasized the role the guidelines play in achieving "[u]niformity and proportionality in sentencing," and noted that "the Guidelines are not only the starting point for most federal sentencing proceedings but also the lodestar." 578 U.S. ___, ___ (2016) (slip op., at 3, 10). The Fourth Circuit has provided the following guidance in the wake of *Booker*:

> A district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines. Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in [18 U.S.C.] § 3553(a) before imposing the sentence.

*United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). Thus, sentencing courts must consider the factors outlined in 18 U.S.C. § 3553(a), including the need for the sentence "to reflect the seriousness of the offense, to promote respect for law, and to provide just punishment for the offense; [and] to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(A) and (B).

### A. *Nature and Circumstances of the Offense*

The nature of the offense is exceedingly grave. As a result of the defendant's distribution of heroin, the Beaudry family lost their daughter forever. In their letter to the Court, Ms.

6

Beaudry's parents remember their daughter as a young woman who could "light up a room with her smile." They grieve, knowing that "there will be no more grandchildren, no wedding to attend, and no Monica." They admit that they never thought this epidemic would strike their family, and share that "it took nine months to bring [Monica] into this world, and only nine months for Heroin to take her out of it." In conclusion, they ask the Court to remember that "[t]his epidemic is not just affecting the dealers and the addicted. It affects the family and friends of all those involved."

The defendant was the leader of a heroin distribution conspiracy that involved at least five people. He had dangerous and illegal weapons at his disposal. He regularly distributed a lethal narcotic to numerous people over an extended period. He continued to do so even after seeing a client overdose on his product. Specifically, after he distributed heroin to A.S. and Monica Beaudry and observed A.S. overdose, he disregarded the obvious risk to their lives and distributed heroin to them again just a few weeks later. Most disturbing of all was his response to a woman dying in his house. When Ms. Beaudry overdosed, he did not seek emergency medical attention for her. He let her die because he did not want to get in trouble. By the time someone brought her to a hospital, it was too late.

With three previous drug convictions and ample opportunities to turn his life around, the defendant defiantly pressed on and continued to sell poison to the community. That heroin was destroying the lives of his clients did not factor at all into his decision-making. In fact, he introduced new users, like Megan Garton, to heroin, and even enticed her to sell it for him. He supplied new dealers, like the USS Bush sailor and his wife, who were themselves later convicted for distributing heroin. His distribution of heroin led to at least three non-fatal overdoses that the government is aware of, two of which occurred on an aircraft carrier. Those

three overdose victims were immediately treated. But for that fast response, the defendant could have been responsible for four deaths instead of one.

It is undisputed that despite watching Ms. Beaudry die—watching her as she foamed at the mouth and lost consciousness—the defendant chose not to call for medical help. One witness described walking into the house and hearing a gargling sound from the defendant's bedroom, a sound consistent with someone's lungs filling up with fluid. That was the sound of a 23-year-old woman's body struggling for life and losing the fight. Had the defendant called 911, Ms. Beaudry might still be alive today.

According to A.S., the defendant refused to do anything for 45 minutes and insisted that emergency personnel not be called. Another witness living at the home told the defendant to do something about Ms. Beaudry's overdose, and reported that at least 40 minutes passed before Ms. Beaudry was put in a car that took her to the hospital.

What makes the defendant's lack of action even more aggravating is that even after knowing his heroin killed Ms. Beaudry, he continued to sell it with absolutely no regard for the possibility that the drugs he was selling could continue to kill. After Monica Beaudry's death, the defendant's heroin distribution resulted in additional overdoses and hospitalizations. Just two months later, in February 2015, two Navy sailors from the USS Bush overdosed from his heroin. That did not stop the defendant either. He continued to deal heroin until his arrest several months later. The heroin he dealt was particularly dangerous because it was laced with fentanyl, a synthetic opioid many times more powerful than pure heroin. The defendant continued to sell it despite his firsthand knowledge of its dangerousness. He did not stop dealing heroin because of some realization about the destruction he had caused. The conspiracy he led stopped because law enforcement agents arrested him.

Beyond the offense of conviction, the advisory guidelines also take into account a number of aggravating factors present in this defendant's case but which were not present in other resulting-in-death cases prosecuted in this district:

    a.    The defendant received a two-point enhancement because firearms were present during the offense. USSG § 2D1.1(b)(1). In fact, no less than three firearms were present, including a loaded sawed-off shotgun, which the defendant kept next to his bed. The presence of this illegal weapon provides a window into the defendant's state of mind during his ongoing heroin distribution conspiracy. The reason to have a weapon like that is to defend one's criminal activities and the proceeds of such activities. The defendant was ready and willing to cause death by his drug distribution. His ownership of the sawed-off shotgun shows he was also prepared to do violence, and had the tools to do violence, to further and protect his trade.

    b.    The defendant received a two-point enhancement because he maintained a premises for the purpose of distributing a controlled substance. USSG § 2D1.1(b)(12). By selling drugs from his home, the defendant was more easily able to involve his roommates and live-in girlfriend in his distribution conspiracy.

    c.    The defendant received a four-level enhancement for being a leader or organizer of a criminal enterprise that involved five or more participants. USSG § 3B1.1(a). The defendant was *the* leader and *the* organizer of the heroin conspiracy, and in fact brought his girlfriend and co-defendant, Megan Garton, a person who had never used heroin before, into the enterprise.

    d.    The defendant did accept responsibility by pleading guilty in a timely manner. Had he not done so, his criminal offense level would have been even further off the chart, at a

level of 51. The defendant has agreed to cooperate pursuant to his plea agreement; however, this is not the appropriate time to address cooperation.

    B.  *History and Characteristics of the Defendant*

  The defendant's history and characteristics further support the recommended sentence. His criminal history shows an utter lack of respect for the law. It started with drug possession, and it continued to escalate in seriousness over the last ten years with multiple instances of failing to comply with court orders and the revocation of supervised probation. In addition to multiple drug convictions, including a prior conviction for possession with intent to distribute, the defendant also has violence on his record. In 2013, he was convicted for assault and battery of his girlfriend at the time, T.H., and he later defied a protective order. The defendant has shown an utter disregard for the authority of the court. He committed the federally-charged offenses while under court supervision. He more than earned his criminal history category of V, which, together with other factors, distinguishes his case from other heroin cases where death or overdoses occurred.

  While this type of criminal record is not foreign to the court, this defendant's record coupled with his background is baffling. The PSR indicates that the defendant grew up in a stable home in Chesapeake, Virginia. He had supportive parents, an education, and many opportunities afforded to him. He attended Tidewater Community College and studied civil engineering for at least five semesters. His father is a school administrator and a clinical psychologist. His sister is an attorney for the Environmental Protection Agency. This background, contrasted with the defendant's criminal history, is not just unusual, it is aggravating. While some defendants might be motivated to engage in narcotics distribution

because they believe it will help them escape poverty, no such hardship pushed the defendant into the life he chose.

    C.    *Need to Afford Adequate Deterrence and the Need to Protect the Public from Further Crimes*

Imposing a life sentence would serve the important purpose of deterring future individuals within the district and beyond from engaging in similar crimes. In addition to causing one death, at least three other people overdosed on heroin distributed by the defendant. All three of them could have died without immediate intervention and treatment. At a time when Virginia and the United States as a whole face a heroin overdose epidemic, it is appropriate to send a message that there is no tolerance for dealing this lethal narcotic, that choosing to do so puts one's "customers" in mortal peril, and that should any of those individuals die or seriously injure themselves with heroin, a lengthy sentence will result. According to the Justice Department's National Heroin Task Force, heroin overdoses increased 406% from 2006 to 2014. NATIONAL HEROIN TASK FORCE FINAL REPORT AND RECOMMENDATIONS at 5 (December 31, 2015). In 2014, more than 10,500 people died from overdoses involving heroin. *Id.* The recent surge in heroin related deaths may be partially attributed to a growing trend among distributors to adulterate heroin with fentanyl—just like the heroin the defendant sold here. *Id.* The National Heroin Task Force recommends a multi-faceted approach to combating this public health crisis, including but not limited to the prosecution of heroin distributors whose product results in death. *Id.* at 12. Dealers must be put on notice that their conduct can result in a permanent loss of freedom.

Aside from considerations of general deterrence, the need to specifically deter this defendant from causing more death dictates a severe punishment. He continued to deal drugs—more deadly drugs—despite three prior drug convictions. He did so after surrounding himself

11

with weapons of violence. Each time the justice system warned him, he responded with escalating criminal conduct. This defendant's behavior shows a clear pattern of contempt for the law and warrants the strongest deterrent the Court can impose.

The government does not make this recommendation lightly. It does not charge every case in which distribution results in death, and it does not normally request a life sentence in the subset of such cases it does charge. Even in light of the growing public health crisis associated with heroin overdoses, it would be inappropriate to recommend a life sentence only out of consideration for general deterrence. This case, though, has the added aggravation of the defendant's specific conduct and significant criminal history. This defendant epitomizes the worst behavior associated with the heroin crisis. Raised in a supportive middle class family, educated, and with innumerable opportunities open to him, the defendant chose to make his living distributing extremely addictive and dangerous drugs. After multiple drug convictions, and numerous other convictions not related to drugs, he still chose to distribute heroin and heroin laced with fentanyl. He associated with people who did not use heroin, introduced them to the poison, and brought them into his criminal enterprise. He directly distributed to at least one individual who overdosed, and then distributed to her again after she recovered. He kept all the tools necessary for his criminal enterprise at his home, including a sawed-off shotgun and other firearms. And in the end, he killed someone, leaving her family devastated. The sentencing guidelines calculated the correct sentence here.

    D.    *Avoiding Unwarranted Sentence Disparities*

The government is aware of one other recent case in this division of the Eastern District in which a defendant pleaded guilty to distribution of heroin resulting in death. In *United States v. Martin*, Crim. Case No. 2:14cr78, the Court sentenced the defendant to 20 years and 10

months of imprisonment. The facts of that case are distinguishable in important ways. In *Martin*, the defendant's calculated guideline range was actually below the statutory mandatory minimum of 20 years due to a lack of criminal history and no prior drug offenses. The sentence of 20 years and 10 months was an upward variance. Martin was not a leader of a drug conspiracy involving five or more people, he did not possess firearms, and he did not maintain a drug premises. He was a low-level dealer without the criminal history that this defendant has.

Second, unlike Martin, the defendant here distributed a large quantity of heroin over the course of at least a year. He involved his friends and associates in that distribution. He saw A.S. overdose, and then distributed drugs to her and Monica Beaudry several weeks later. After Ms. Beaudry died, he continued to distribute heroin, including to a U.S. Navy sailor and his wife, that led to additional overdoses. The callous disregard for life that the defendant repeatedly exhibited justifies a sentence significantly higher than the one imposed in the *Martin* case.

The Alexandria division of this Court has also sentenced defendants in death-resulting cases. The Honorable Leonie Brinkema sentenced Eugene A. Williams to 30 years' imprisonment following his guilty plea to Conspiracy to Distribute One Kilogram or More of Heroin, in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(A), and Possessing a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c). *See United States v. Eugene Asomani Williams*, Crim. Case No. 1:13cr464. Two key facts distinguish *Williams* from the instant case. The defendant in *Williams* had an Offense Level of 40 (eight levels below the defendant here) and a Criminal History Category VI, which put his guidelines range at 360 months to life. He was sentenced at the low end of the guidelines range. The second distinguishing factor was that the defendant was not present during the three overdose deaths caused by his heroin. The statement of facts in that case did not indicate whether the defendant

13

knew that the deaths had occurred. Here, of course, the defendant knew that the death occurred because he was there when the overdose happened and refused to do anything about it. He then continued to sell heroin.

Judge Brinkema also presided over the bench trial in *United States v. Antowan Thorne*, Crim. Case No. 1:14cr165, which involved the heroin overdose death of a young woman. The defendant was acquitted after trial of Conspiracy to Distribute 100 grams or More of Heroin Resulting in Death, but found guilty of the lesser included offense of Conspiracy to Distribute 100 Grams or More of Heroin, in violation of 21 U.S.C. §§ 846 and 841(a)(1). The death enhancement was not applied in that case. The victim in that case died from heroin combined with a common antihistamine. Judge Brinkema sentenced the defendant to 25 years. Thorne had a guidelines range of 262 to 327 months' imprisonment, as the result of an Offense Level of 34 (14 points below the defendant here) and a Criminal History Category VI. Also, as in the *Williams* case, Thorne was not directly involved in the death of his buyer, and certainly not in a position to save her, the way the defendant here was. Thorne's conduct was limited to the transaction, and the court documents do not indicate whether he continued to sell heroin or whether he was aware the death had occurred.

The defendant's heroin conspiracy also resulted in three additional felony convictions. He got Megan Garton addicted to heroin and made her a subordinate in his drug operation. He even had her selling heroin for him. She is scheduled to be sentenced on May 31, 2016. A Navy sailor and his wife both pleaded guilty to Conspiracy to Distribute Heroin, in violation of 18 U.S.C. §§ 841(a)(1) and (b)(1)(C), and received sentences of 18 and 15 months, respectively. *See* Crim. Case No. 2:15cr149.

To sentence the defendant to life imprisonment while other defendants in the conspiracy serve relatively short prison sentences would not create an unwarranted disparity. None of the co-conspirators were involved in the distribution that resulted in Ms. Beaudry's death. None of them exhibited the callous disregard for human life that the defendant showed toward Ms. Beaudry. On the contrary, when the Navy sailor's wife observed her husband's overdose, she immediately ran for help, despite the fact that seeking assistance could result in criminal charges for her. The Navy sailor and his wife conspired to distribute heroin to another sailor, but they did not make a living from selling heroin, as the defendant did. No evidence suggests that the Navy sailor and his wife possessed any firearms in connection with heroin distribution, least of all a loaded sawed-off shotgun. Importantly, none of the related defendants had any significant criminal history. Put simply, the Navy sailor and his wife received sentences that took into consideration the nature and circumstances of their offense and their personal histories. Those same considerations lead the government to recommend a life sentence for this defendant.

## VII. CONCLUSION

Justice in this case will still fail to bring Monica Beaudry back to her parents. A life sentence, however, will ensure that Virginians are protected from this defendant and that he will be held accountable for his part in Ms. Beaudry's death and his refusal to save her life. This recommended sentence will send an unmistakable message that repeat dealers who continue to sell heroin after knowing a death has occurred will be met with the utmost punishment.

                                          Respectfully submitted,

                                          DANA J. BOENTE
                                          UNITED STATES ATTORNEY

By:           /s/          
Alyssa Nichol
John F. Butler
Special Assistant United States Attorneys
Attorneys for the United States
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, Virginia 23510
Telephone: (757) 441-6331
Facsimile: (757) 441-3205
E-mail:      Alyssa.Nichol@usdoj.gov
              John.F.Butler@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on the 12th day of May, 2016, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to:

Lawrence H. Woodward, Jr.
Shuttleworth, Ruloff, Swain, Hadded & Morecock
Attorney for Defendant
4524 South Boulevard
Suite 300
Virginia Beach, VA 23452-1137
Telephone: (757) 671-6000

                                                      /s/
                                      John F. Butler
                                      Special Assistant United States Attorney
                                      Attorney for the United States
                                      United States Attorney's Office
                                      101 West Main Street, Suite 8000
                                      Norfolk, Virginia 23510
                                      Telephone: (757) 441-3554
                                      Facsimile: (757) 441-3205
                                      E-mail: John.F.Butler@usdoj.gov